**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re:<br><br>NASSIM S. AOUDE<br><br>Debtor | ) ) ) ) ) ) ) ) | Chapter 7<br>Case No. 19-40474-CJP |
| AUTISM INTERVENTION SPECIALISTS, LLC<br><br>Plaintiff<br><br>v.<br><br>NASSIM S. AOUDE<br><br>Defendant | ) ) ) ) ) ) ) ) ) ) ) ) ) | Adversary Proceeding<br>No. 19-04026-CJP |

**MEMORANDUM OF DECISION**
**ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is a motion for summary judgment (the "Motion") filed by Defendant Nassim S. Aoude, who is the debtor in the main bankruptcy case. Def.'s Mot. Summ. J., Dkt. No. 18. Plaintiff Autism Intervention Specialists, LLC ("AIS"), opposes the Motion. Pl.'s Opp'n, Dkt. No. 24. For the reasons discussed below, I will deny Mr. Aoude's Motion as filed but may grant him summary judgment on other grounds I have raised *sua sponte*, after providing the parties with an opportunity to address those grounds. *See* Fed. R. Civ. P. 56(f)(2)-(3); Fed. R. Bankr. P. 7056 (applying Civil Procedure Rule 56 in adversary proceedings).

1

I.      **Background**[1]

At all times relevant to the Complaint, Mr. Aoude was a board-certified behavior analyst and a licensed applied behavior analyst. Def.'s Facts ¶ 1, Dkt. No. 20; Pl.'s Facts Resp. ¶ 1, Dkt. No. 25. In early 2011, Mr. Aoude began providing autism services through AIS, which he founded. *See* Def.'s Facts ¶ 2; Pl.'s Facts Resp. ¶ 2; Pl.'s Opp'n Ex. R ("N. Aoude Dep.") 14:12-20, Dkt. No. 24-10. He served as AIS's chief executive officer. Def.'s Facts ¶ 2; Pl.'s Facts Resp. ¶ 2.

In October 2013, as AIS's sole member and manager, Mr. Aoude executed an Equity Interest Purchase Agreement ("Purchase Agreement" or "EIPA"), selling his entire membership interest in AIS to Pacific Child & Family Associates, LLC ("PCFA"). *See* Def.'s Facts ¶ 4; Def.'s Ex. C, EIPA 1, Dkt. No. 21-3; Def.'s Ex. E, EIPA Disclosure Sch. 4.1(b), Dkt. No. 21-5; Pl.'s Facts Resp. ¶ 4.[2]  Among other things, the Purchase Agreement provided that Mr. Aoude

---

[1] In addition to each party having filed a brief as to their respective positions (Dkt. Nos. 19, 24): Mr. Aoude has filed a statement of material facts (Dkt. No. 20); AIS has responded to that statement and has asserted additional material facts (Dkt. No. 25); and each party has filed exhibits (Dkt. Nos. 21, 24). Unless otherwise noted, the facts discussed herein are undisputed at least for purposes of the Motion. No party disputes the authenticity of the materials in the summary judgment record. Some additional details that are not subject to genuine dispute have been drawn from those materials. *See* Fed. R. Civ. P. 56(c)(3); Fed. R. Bankr. P. 7056. As to its asserted additional material facts (which are a mix of factual allegations and legal arguments), AIS suggested at a hearing on the Motion that, because Mr. Aoude did not file a further statement controverting those facts, they should be deemed to have been admitted. I decline to deem AIS's asserted additional facts as admitted, because a nonmoving party such as AIS is generally not entitled to such procedural relief, and, in any event, even if such facts were deemed to be admitted they would not change the outcome of this decision. *See* D. Mass. L.R. 56.1; MLBR 7056-1, 9029-3; *see also Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56–57 (1st Cir. 2011) (discerning no error in case where district court's local rule specifically provided for counterstatement of facts procedure and trial court did not "'deem admitted' the supplemental facts" because "[t]o the extent that the items are factual, deeming them admitted [did] not change the outcome of the case [and t]o the extent that they are non-facts, they are equally impuissant").

[2] As a material fact, Mr. Aoude states: "By document titled Equity Interest Purchase Agreement (the Purchase Agreement) dated October 18, 2013[,] [PCFA] purchased Aoude's membership interest in AIS." Def.'s Facts ¶ 4 (citing EIPA). In response, AIS does not dispute any specific assertion. AIS does state: "Disputed that Aoude adequately or completely sets forth the provisions of the Purchase Agreement which speaks for itself and to which direct reference may be had." Pl.'s Facts Resp. ¶ 4. From AIS's statement and apparent agreement as to the operative version of the EIPA, I do not perceive any genuine

2

would receive immediate and future cash payments and a membership interest in PCFA's parent company. EIPA §§ 1.1-1.6. The Purchase Agreement also provided for Mr. Aoude's continued employment with AIS, and it limited his ability to provide professional services in competition with AIS. *See, e.g.*, EIPA §§ 5.3-5.6; *see also* EIPA § 6.1(d) (referencing "Employment Agreements attached to this Agreement" that were not included among summary judgment materials or otherwise in the record). He was permitted, however, "to see individual patients and provide clinical services in an individual or BCBA supervisory capacity (overseeing a maximum a [sic] fifteen cases) to individuals and families."[3] EIPA § 5.5.

In a schedule to the Purchase Agreement, Mr. Aoude disclosed that a tort lawsuit was pending in state court against him, AIS, and another person (the "Preexisting Litigation").[4] *See* Def.'s Facts ¶¶ 6-7; EIPA § 4.21; Def.'s Ex. E, EIPA Disclosure Sch. 4.21; Pl.'s Facts Resp. ¶¶ 6-7. The Purchase Agreement required Mr. Aoude to defend and indemnify AIS from and against all costs and liabilities arising from the Preexisting Litigation. *See* EIPA § 7.2(a)(iii); N. Aoude Dep. 25:13-26:13; *see also* EIPA 43 (defining "'Designated Pre-Closing Liabilities'" in subsection (g) as referenced in § 7.2(a)(iii)).

At some point after executing the Purchase Agreement, Mr. Aoude began providing autism services apart from AIS through another entity. Def.'s Facts ¶ 8; Pl.'s Facts Resp. ¶ 8. The parties dispute the timing and extent of this new practice. *Compare* Def.'s Facts ¶ 8, *and* N.

---

dispute regarding this fact. *See* Fed. R. Civ. P. 56(c)(1), (e)(2).

[3] Although undefined, "BCBA" presumably refers to Board Certified Behavior Analyst.

[4] In his material facts, Mr. Aoude states that "AIS listed" the Preexisting Litigation on the relevant disclosure schedule. Def.'s Facts ¶¶ 6-7. It is undisputed that at the time that the disclosure schedule was generated Mr. Aoude was solely in control of AIS and was the only individual who would have acted on AIS's behalf in making disclosures for the Purchase Agreement.

3

Aoude Dep. 87:5-88:6, 129:3-130:1, *with* Pl.'s Facts Resp. ¶¶ 8, 31-40, 52-55. In mid-2014, Mr. Aoude left his employment with AIS while certain terms of the Purchase Agreement were ongoing, including the potential for Mr. Aoude to receive further payments based upon AIS's financial performance and the limits on his ability to engage in competing work. *See, e.g.*, EIPA §§ 1.6, 5.5; N. Aoude Dep. 39:22-23; *see also* EIPA 49 (defining "'Restricted Period'" as referenced in § 5.5). Approximately fifteen months later in New York state court, Mr. Aoude sued PCFA, AIS, and others involved in the Purchase Agreement, asserting claims such as breach of contract and fraudulent misrepresentation. Def.'s Facts ¶ 9; Pl.'s Facts Resp. ¶ 9; Pl.'s Opp'n Ex. S, Dkt. No. 24-11.[5] In response, PCFA and AIS asserted similar counterclaims. *See* Def.'s Facts ¶ 9; Pl.'s Facts Resp. ¶ 9; Pl.'s Opp'n Ex. T 15-30, Dkt. No. 24-12. The entities alleged that Mr. Aoude never intended to honor the Purchase Agreement's limits on competition, knowingly hid this intention, and thereby fraudulently induced PCFA into executing the Purchase Agreement.[6] The entities also alleged that Mr. Aoude subsequently breached the Purchase Agreement, including its covenants not to compete. Separately, in Massachusetts state

---

[5] In his material facts, Mr. Aoude generally describes this and another state court lawsuit discussed below. *See* Def.'s Facts ¶ 9. AIS does not dispute any specific assertion. Rather, it "[d]ispute[s] that Aoude adequately or completely sets forth the allegations of the pleadings . . ., which speak[] for themselves and to which direct reference may be had." Pl.'s Facts Resp. ¶ 9. AIS provided copies of the relevant state court pleadings among its exhibits. *See* Pl.'s Opp'n Exs. S-U. Despite AIS's professed dispute here, none exists for the purposes of addressing this Motion. *See* Fed. R. Civ. P. 56(c)(1), (e)(2).

[6] The entities' counterclaim asserts that "[h]ad [PCFA] and AIS been aware of [Mr.] Aoude's plan . . . [they] would not have entertained let alone entered into the [Purchase Agreement]." Pl.'s Opp'n Ex. T 22 (¶ 32). It also asserts that PCFA and AIS relied on allegedly false representations from Mr. Aoude when entering into the Purchase Agreement. *Id.* at 26 (¶¶ 52-55). As to AIS, such assertions are a factual and legal impossibility. Although AIS was a separate legal entity, Mr. Aoude was the sole member and manager of AIS at the time of the Purchase Agreement. AIS thus did not separately entertain or enter into the Purchase Agreement with him, and AIS could not have been relying upon representations, false or otherwise, from Mr. Aoude. His knowledge is imputed to AIS. Alone in acting on AIS's behalf, Mr. Aoude could not have fraudulently induced himself into executing the Purchase Agreement.

4

court, PCFA and AIS also sued Mr. Aoude's new practice, his father, his cousin, and another allegedly related entity, asserting that each had a role in Mr. Aoude's alleged scheme to compete with PCFA and AIS in violation of the Purchase Agreement. Def.'s Facts ¶ 9; Pl.'s Facts Resp. ¶ 9; Pl.'s Opp'n Ex. U, Dkt. No. 24-13.

In March 2016, the two lawsuits were resolved through a global Settlement Agreement and Release ("Settlement Agreement" or "SAR"). Def.'s Facts ¶ 10; Pl.'s Facts Resp. ¶ 10; Def.'s Ex. G, SAR, Dkt. No. 21-7. Each party denied wrongdoing and liability. SAR ¶ 14. Mr. Aoude agreed to release an estimated $463,000 in escrowed funds and to pay $1,000,000 in additional funds to PCFA's parent company over an approximately 18-month period.[7] SAR ¶¶ 1, 3. He also agreed to forfeit his interest in the parent company. SAR ¶ 2. The parties agreed to void the Purchase Agreement's (and related agreements') restrictive covenants, which included the limits on Mr. Aoude's ability to engage in competing work.[8] See SAR ¶ 7. Among other provisions, the parties further agreed to mutual releases of liability. See SAR ¶¶ 9-12. Mr. Aoude also "reaffirm[ed] his existing indemnification obligation, including but not limited to his obligation to indemnify AIS," in the Preexisting Litigation that Mr. Aoude had disclosed at the time of the Purchase Agreement. SAR ¶ 6.

In March 2018, Mr. Aoude's new practice closed "after Blue Cross[] Blue Shield, the primary insurance company providing insurance coverage for approximately 80% of its clients, refused to pay for services rendered." Def.'s Facts ¶ 15; Def.'s Ex. H ("BCBS Letter"), Dkt. No. 21-8; Pl.'s Facts Resp. ¶ 15. Within a year after his practice closed, Mr. Aoude stopped

---

[7] It is undisputed that Mr. Aoude paid these amounts, which amounts are not the subject of any claims in this adversary proceeding or the main bankruptcy case.

[8] The parties did, however, also agree that certain parties' ability to solicit or hire AIS employees would be restricted for the duration of the Settlement Agreement's payment term. See SAR ¶ 5.

5

paying AIS's defense costs in the Preexisting Litigation, citing his inability to afford those payments.  Def.'s Facts ¶ 17; N. Aoude Dep. 123:24-124:9; Pl.'s Facts Resp. ¶ 17.[9]

In March 2019, about a year after his practice closed, Mr. Aoude filed an individual petition under Chapter 7 of the Bankruptcy Code.[10]  *See* Def.'s Facts ¶ 18; Pl.'s Facts Resp. ¶ 18; Pet., *In re Aoude*, Case No. 19-40474 (Bankr. D. Mass. Mar. 26, 2019).  Mr. Aoude listed AIS as a creditor holding a nonpriority unsecured claim of "[u]nknown" value, which he denoted as disputed but not contingent or unliquidated.  Sch. E/F at 4 (No. 4.4) & Attach. 1, *In re Aoude*, Case No. 19-40474 (Bankr. D. Mass. Mar. 26, 2019), Dkt. No. 1-1 (describing claim as "Demand for legal fees regarding lawsuit involving debtor's business").  He also listed AIS as a co-debtor on two debts related to the Preexisting Litigation and on another unrelated debt.  *See* Sch. H at 2 (No. 3.6), *In re Aoude*, Case No. 19-40474 (Bankr. D. Mass. Mar. 26, 2019), Dkt. No. 1-1; Sch. E/F at 5 (No. 4.8), 10 (No. 4.23), 18 (No. 4.46).  He did not list any other adverse party from the Purchase Agreement or Settlement Agreement on his bankruptcy schedules or statements.  It appears to be undisputed that Mr. Aoude has no outstanding obligations to those other parties.  *See, e.g.*, Def.'s Facts ¶¶ 11, 14; N. Aoude Dep. 123:9-23, 124:10-13; Pl.'s Facts Resp. ¶ 14.[11]

---

[9] The parties dispute the precise timing for when Mr. Aoude stopped paying.  *Compare* Def.'s Facts ¶¶ 16-17 (asserting that Mr. Aoude "defended the [Preexisting Litigation] until calendar year 2019" and until he "'went bankrupt'"), *with* Pl.'s Facts Resp. ¶¶ 16-17 (asserting that new counsel for AIS entered appearance in Preexisting Litigation in April 2018 and that new counsel's fees "have gone unpaid").  As will be evident later, the precise timing within this timeframe need not be pinpointed for the purposes of addressing the Motion, as it would not alter my analysis or conclusions.

[10] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code" or "Code").

[11] In his material facts, Mr. Aoude states simply that he "paid in full" the amount owed under the Settlement Agreement and that he "released" escrowed funds.  Def.'s Facts ¶ 14.  AIS does not dispute that Mr. Aoude took such actions.  AIS responds: "Disputed that the payment . . . and release . . . represent[] payment 'in full' as suggested.  To the contrary, Aoude also remained obligated under the Settlement Agreement to continue to defend and indemnify AIS [in the Preexisting Litigation]."  Pl.'s

6

In July 2019, AIS commenced this adversary proceeding seeking to prevent Mr. Aoude from discharging in bankruptcy "the debt owed to AIS" and asserting that "the obligation of [Mr.] Aoude to AIS is a debt 'for fraud' so as to bring the debt within the [exceptions to discharge set forth in] 11 U.S.C. §523(a)(2)(A) and 11 U.S.C. §523(a)(4)." Compl. ¶¶ 1-2, Dkt. No. 1. More specifically, the "debt" and "obligation" arise from Mr. Aoude's defense and indemnification obligations in connection with the Preexisting Litigation. *See* Def.'s Facts ¶ 19; Pl.'s Facts Resp. ¶ 19; Compl. ¶¶ 30, 33-34; N. Aoude Dep. 7:24-8:7, 36:13-36:19, 106:1-6.[12] In September 2019, AIS filed a proof of claim in the main bankruptcy case. Claim No. 17, *In re Aoude*, Case No. 19-40474 (Bankr. D. Mass. Sept. 3, 2019). In it, AIS asserts that from late February 2018 (around when Mr. Aoude's new practice closed) to August 2019, Mr. Aoude owes $28,721.91 for AIS's defense costs in the Preexisting Litigation, noting that such costs continue to accrue. *See* Claim No. 17 Ex. C (reflecting that $17,641.00 is alleged to have accrued prepetition); Def.'s Facts ¶ 15; BCBS Letter; Pl.'s Facts Resp. ¶ 15.[13] AIS projects that

---

Facts Resp. ¶ 14. Mr. Aoude does not contend that any such obligation has been satisfied. *See* Def.'s Facts ¶¶ 17, 19; N. Aoude Dep. 123:24-124:3, 124:10-13, 131:21-132:8.

[12] In his material facts, Mr. Aoude states that the "Adversary Proceeding has been filed to prevent the discharge of [Mr.] Aoude's agreement in the Purchase Agreement *and Settlement Agreement* to continue to provide a defense in the [Preexisting Litigation]." Def.'s Facts ¶ 19 (emphasis added). AIS purports to dispute these facts, asserting that it's also seeking to prevent the discharge of Mr. Aoude's Preexisting Litigation-related obligations under the "March 11, 2015 Settlement Agreement and Release"—misstating the year of that agreement and possibly having misread Mr. Aoude's statement as not including the Settlement Agreement. *See* Pl.'s Facts Resp. ¶ 19. It is also possible that AIS disputes Mr. Aoude's reference only to "defense" without mentioning "indemnification." *See* Pl.'s Facts Resp. ¶ 12 (disputing Mr. Aoude's statement "agreed to continue to defend" by asserting that Settlement Agreement required Mr. Aoude both "to *defend*" and "to *indemnify*"). *But see* SAR ¶ 6 (referencing only "indemnification" and "indemnify"). Mr. Aoude has not denied having agreed to indemnify, indicating that omissions of that term were inadvertent. *See* Answer ¶ 30, Dkt. No. 7. Even if there is a dispute about the extent of Mr. Aoude's obligations, it would not affect my analysis.

[13] I note that another proof of claim filed in May 2019 in the main case for AIS's defense costs in the Preexisting Litigation, which was scheduled as a joint debt of Mr. Aoude and AIS, reflects a similar timeline for when payments ended, asserting that the last payment was made in early February 2018 (leaving a $0.00 balance due) and that no payments were made from March 2018 through April 2019

7

additional defense costs through trial in the Preexisting Litigation will total $150,000.  Claim No. 17 Ex. D.  AIS further estimates that the plaintiff in the Preexisting Litigation could receive a "demanded" $750,000.  *See id.*  Thus, AIS asserts a total nonpriority unsecured claim for $928,721.91 based upon the accrued and projected amounts.

As noted, Mr. Aoude has moved for summary judgment in this adversary proceeding, and AIS has opposed it.  Having considered the parties' filings, the arguments of counsel at a hearing on the matter, and the record before me, for the reasons below I deny Mr. Aoude's Motion, but also address the possibility of granting him summary judgment on other grounds.

## II.      Legal Standards

### a.      Summary Judgment

If a party seeking summary judgment "shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law," the court must grant summary judgment in his favor.  Fed. R. Civ. P. 56(a); *see also* Fed. R. Bankr. P. 7056 (applying Civil Procedure Rule 56 to adversary proceedings).  To establish that it is entitled to summary judgment, a party may show that the adverse party lacks sufficient admissible evidence to meet its burden of proof at trial.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Similarly, upon evaluating or identifying for the parties the undisputed material facts, and after giving the parties notice and reasonable time to respond, the court may grant summary judgment on grounds raised solely by the court, including a party's lack of sufficient admissible evidence to meet its burden at trial.  *See* Fed. R. Civ. P. 56(f)(2)-(3); *cf. Celotex*, 477 U.S. at 322-23.  A "principal purpose[] of the summary judgment rule is to

---

(leaving a $33,692.19 balance due).  *See* Claim No. 1, *In re Aoude*, Case No. 19-40474 (Bankr. D. Mass. May 9, 2019) (supporting invoices list AIS as client in Preexisting Litigation); Pet. at 32 (4.23).

8

isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323-24 (interpreting prior but substantively similar version of Rule 56); *see also* Fed. R. Civ. P. 56 advisory committee's note to 1987, 2007, 2009, 2010 amendments (noting that changes have been stylistic or related to specific procedures but not affecting summary judgment standard).[14]

### b. Bankruptcy Code § 523

Section 523 of the Bankruptcy Code excepts certain types of debt from being discharged in bankruptcy. Subsections (a)(2)(A) and (a)(4) are at issue here. Subsection (a)(2)(A) excepts from discharge "any debt . . . for money, property, services, or . . . credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A). Subsection (a)(4) excepts from discharge "any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). As is apparent from the quoted language, subsections (a)(2)(A) and (a)(4) have some overlapping and some differing elements, discussed further as needed in the analysis below. *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 363 (2016). A creditor seeking to have a debt owed to it excepted from a debtor's discharge under one of these subsections must establish, by a preponderance of the evidence, each element of the asserted exception. *Palmacci v. Umpierrez*, 121 F.3d 781, 787-88 (1st Cir. 1997) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)). A creditor's failure or inability to do so as to any element dooms the claim—including, potentially, before trial, as discussed above. *See id.* at 787-88; *Celotex*, 477 U.S. at 322-23.

---

[14] I note that both parties quoted from and cited Rule 56 as it existed before it was significantly revised and restructured through an amendment effective in 2010. *See* Def.'s Mot. Summ. J. Mem. 2, Dkt. No. 19; Pl.'s Opp'n 8-9, Dkt. No. 24. This was not material to disposition of the Motion.

### III.     Analysis

Under a single "Cause of Action" in its Complaint, AIS incorporates both § 523(a)(2)(A) and § 523(a)(4). While generally acknowledging that § 523(a)(2)(A) addresses three types of fraud—false pretenses, false representations, and actual fraud—AIS does not state the particular type being asserted here. *See* Compl. ¶¶ 2, 36; *see also Dewitt v. Stewart (In re Stewart)*, 948 F.3d 509, 520-21 (1st Cir. 2020) (comparing elements of § 523(a)(2)(A)'s fraud subtypes). Similarly, AIS generally acknowledges that § 523(a)(4) focuses on multiple types of misconduct—fraud while acting in a fiduciary capacity, as well as embezzlement, larceny, and defalcation while acting in a fiduciary capacity—but does not specify any particular type being pursued. *See* Compl. ¶¶ 2, 36; *see also Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-75 (2013) (comparing select elements among § 523(a)(4)'s misconduct types and noting, among other distinctions, that "'defalcation,' unlike 'fraud,' may be used to refer to *nonfraudulent* breaches of fiduciary duty").

AIS asserts that the alleged debt is one for fraud. Compl. ¶¶ 2, 37-38. From AIS's allegations about misrepresented intentions and assertions of fraudulent inducement, it is clear on this record that AIS is pursuing a fraudulent misrepresentation (or deceit) theory of fraud under § 523(a)(2)(A) and § 523(a)(4). *See Stewart*, 948 F.3d at 520-21; *Bullock*, 569 U.S. at 275; *see also Palmacci*, 121 F.3d at 786-87 (discussing typical common law elements of fraudulent misrepresentation). As such, my analysis focuses on fraudulent misrepresentation.[15] It also

---

[15] *Palmacci* is often relied upon for its description of "the traditional common law rule" for fraudulent misrepresentation, as drawn from § 525 of the Restatement (Second) of Torts. *See Palmacci*, 121 F.3d at 786; *see also Stewart*, 948 F.3d at 520; *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001). This version of the rule contemplates that the requisite false representation will have been made to the party who is thereby induced into action or inaction and who ultimately suffers a resulting pecuniary loss. *See Palmacci*, 121 F.3d at 786. That is not this case. PCFA was allegedly fraudulently induced by Mr. Aoude into executing the Purchase Agreement, but PCFA is not a party to this adversary proceeding. Rather, AIS is the party alleging damages. At the hearing on Mr. Aoude's Motion, his counsel suggested

seems clear that AIS is not asserting a theory of embezzlement, larceny, or defalcation while acting in a fiduciary capacity under § 523(a)(4), as AIS has offered no factual support in the Complaint for such theories and none is apparent from the summary judgment record.[16]  *See Bullock*, 569 U.S. at 275.

### a. **Mr. Aoude's Motion for Summary Judgment**

Requesting summary judgment in his favor, Mr. Aoude emphasizes that AIS seeks to prevent only the discharge of his obligations as to the Preexisting Litigation, and he contends that the record contains no evidence of fraud in relation to those obligations.  Mr. Aoude notes that, in connection with the Purchase Agreement, he disclosed the Preexisting Litigation.  He states that he "agreed to continue defending the [Preexisting] Litigation and [to] indemnify PCFA . . . [if] judgment in that litigation w[ere to be] granted to the plaintiffs."  Def.'s Mot. Summ. J. Mem. 1, Dkt. No. 19.  He also notes that, in the Settlement Agreement, he reaffirmed his Preexisting Litigation-related obligations.  *See* Def.'s Mot. Summ. J. Mem. 2.  There are no allegations that, when making these specific commitments, Mr. Aoude intended not to honor them or otherwise engaged in any deceit specifically relating to these obligations.  In fact, it is undisputed that Mr. Aoude paid for AIS's defense in the Preexisting Litigation for more than

---

that only a deceived party could claim damages, implying that AIS cannot be the proper party to bring this nondischargeability action.  Neither § 523(a)(2)(A) nor § 523(a)(4) specifies that a creditor seeking the nondischargeability of a debt must have been the one deceived.  *See Stallworth v. McBride (In re McBride)*, 512 B.R. 103, 112 (Bankr. D. Mass. 2014).  For purposes of this decision, I assume without deciding that a party other than the one deceived is not precluded from seeking relief.  If this matter proceeds to trial, I expect the parties will address this issue further.

[16] Further as to AIS's fiduciary fraud claim under § 523(a)(4), the parties have not addressed whether the fiduciary component is factually supported.  Although a lack of factual support could provide other grounds for partial summary judgment on the Court's own motion, it is beyond the scope of the discussion in this decision.

four years after the Purchase Agreement and two years after the Settlement Agreement—until after his new practice closed.

In response, AIS contends that Mr. Aoude has impermissibly narrowed or misperceived AIS's argument. AIS asserts, and Mr. Aoude disputes, that certain evidence related to Mr. Aoude's new practice supports an inference that he never intended to comply with the Purchase Agreement's limits on competition.[17] *See, e.g.*, Pl.'s Opp'n 3-6; N. Aoude Dep. 45:20-55:16, 61:5-10, 64:9-65:24, 69:24-70:23, 71:17-24, 101:20-102:11, 104:17-104:22; *see also Stewart*, 948 F.3d at 523 (noting that "inference[s] may be derived from the totality of circumstances, including from circumstantial facts and post-transaction conduct"). AIS maintains that, had PCFA known that Mr. Aoude intended to compete in violation of the agreed upon limits, PCFA would not have executed the Purchase Agreement, thereby avoiding exposure to the risks of associated losses, including those due to any failure of Mr. Aoude to defend and indemnify AIS in the Preexisting Litigation as agreed. *See* Pl.'s Opp'n 2, 6, 10-11. AIS thus asserts that, but for Mr. Aoude (allegedly) fraudulently inducing PCFA into executing the Purchase Agreement, AIS would not be facing defense costs and potential liabilities associated with the Preexisting Litigation, now that Mr. Aoude is no longer meeting—and is seeking a bankruptcy discharge of—his contractual obligations to defend and indemnify AIS in that Preexisting Litigation.[18] *See id.* As will be discussed below, AIS's theories of causation and damages are problematic.

---

[17] In its Complaint, AIS also asserts that Mr. Aoude had a "plan to withhold his cooperation in the integration of the business." Compl. ¶ 25; *see also* Compl. ¶ 5; Pl.'s Opp'n 1, 2, 3, 6, 10. There appears to be no factual support alleged in the Complaint or within the summary judgment record for this assertion, and it is unclear how it fits into AIS's overall argument.

[18] For simplicity, I have taken a broad view of AIS's arguments. AIS erroneously includes itself in certain assertions—for example: "Had AIS been aware of [Mr.] Aoude's plan . . . AIS would not have entertained let alone entered into the underlying transaction that exposed it to ongoing liability for [the Preexisting Litigation]." *See* Pl.'s Opp'n 2, 6, 11; *see also* Pl.'s Facts Resp. ¶ 58. As explained above, *see supra* note 6, because AIS was entirely controlled by Mr. Aoude at the time of the Purchase

12

Ultimately, AIS contends that because Mr. Aoude's debt to AIS originates from his alleged fraud in inducing PCFA into executing the Purchase Agreement, the debt is nondischargeable, notwithstanding any liability waivers in the Settlement Agreement. *See* Pl.'s Opp'n 11-16. AIS appears to argue that, because material facts are genuinely disputed as to whether Mr. Aoude made a fraudulent misrepresentation to PCFA, summary judgment is not possible. *See* Pl.'s Opp'n 11-12, 15-16; *see also Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995) (describing "material" disputed facts as those with "potential to change the outcome of the suit under the governing law"); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (describing "genuine" disputes as those where "evidence, viewed in the light most favorable to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party" (citation omitted)).

I agree that Mr. Aoude presented an overly narrow version of AIS's position in his Motion and that summary judgment cannot be granted based upon the reasons specifically advanced by Mr. Aoude. I disagree, however, that any genuinely disputed facts as to whether Mr. Aoude deceived PCFA are material such that summary judgment is necessarily precluded on this record.

### b. Other Grounds for Summary Judgment

Although not sufficient to support entry of summary judgment based upon the reasons asserted, Mr. Aoude's Motion highlights a seeming disconnect between his alleged misconduct and AIS's alleged damages. While any debt for liability that arises from fraud may be

---

Agreement, it could not have separately entertained or entered into the Purchase Agreement. Further, as discussed below, AIS's exposure to liability for the Preexisting Litigation did not result from Mr. Aoude's default on his contractual obligations to defend and indemnify AIS. Rather, the exposure arose from AIS being a defendant facing defense costs and potential direct liability in the Preexisting Litigation, an ongoing circumstance that existed before and entirely apart from the Purchase Agreement.

13

determined to be nondischargeable in an individual debtor's bankruptcy, *e.g.*, *Cohen v. de la Cruz*, 523 U.S. 213, 218-19, 223 (1998), liability does not necessarily follow from every fraudulent misrepresentation, *see Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 67 (1st Cir. 2012). To establish a defendant's liability, causation is among the elements that the plaintiff must prove. *Goguen*, 691 F.3d at 67. In this context, causation has two components: cause in fact and legal cause. *Id.* at 67, 69-71. If the plaintiff cannot establish both components, the plaintiff cannot establish the defendant's liability—in tort under a fraudulent misrepresentation theory—for the plaintiff's claimed damages. Without establishing such liability, the plaintiff cannot succeed in establishing that its damages are a nondischargeable debt of the debtor under the fraudulent misrepresentation-based exceptions to discharge in § 523(a)(2)(A) and § 523(a)(4). *See id.*; *Palmacci*, 121 F.3d at 786-88.

As noted, AIS has alleged that Mr. Aoude fraudulently misrepresented his intent to PCFA—alleging specifically that Mr. Aoude intended to compete while manifesting his agreement not to—thereby fraudulently inducing PCFA into executing the Purchase Agreement, which, among numerous other provisions, obligated Mr. Aoude to defend and indemnify AIS in the Preexisting Litigation. With Mr. Aoude no longer meeting those contractual obligations, AIS contends that the alleged deceit that induced PCFA to sign the Purchase Agreement set off the chain of events that led to AIS's alleged damages, i.e., having to pay its own defense costs and potentially further costs of a judgment or settlement in the Preexisting Litigation.

AIS's "but for" argument here focuses on cause in fact. This element is established when one's justifiable reliance upon a fraudulent misrepresentation is shown to have been a substantial factor in deciding whether to take the action (or not) that resulted in the loss.

14

Restatement (Second) of Torts § 546 & cmt. b; *see also Goguen*, 691 F.3d at 67.[19] Setting aside the justifiable reliance and action components, the misrepresentation must be shown to have caused a claimed loss. Restatement (Third) of Torts: Liab. for Econ. Harm §§ 9, 11; *see also id.* § 11 cmt. a (noting "usual requirement in tort that a defendant's wrong be a factual or 'but for' cause of the harm that the plaintiff suffered").

AIS appears to be unable to establish that Mr. Aoude's alleged misrepresentation to PCFA caused the alleged "loss" to AIS. Prior to and after the date that Mr. Aoude and PCFA executed the Purchase Agreement, AIS was and is a defendant in the Preexisting Litigation, facing defense costs and exposure for a potential judgment or settlement. Contrary to AIS's "but for" argument above, Mr. Aoude's alleged misrepresentation to PCFA, which induced PCFA into executing the Purchase Agreement, placed AIS (as opposed to PCFA) in a *better position* as to the Preexisting Litigation, because as part of the Purchase Agreement Mr. Aoude agreed to defend and indemnify AIS, mitigating AIS's exposure.[20] Mr. Aoude's subsequent default on his contractual obligations caused AIS to pay for its own defense. That ongoing expense and related potential losses are due to AIS's status as a defendant in the Preexisting Litigation, not due to Mr. Aoude's alleged misrepresentation to PCFA. AIS argues that PCFA never would have signed the Purchase Agreement had Mr. Aoude not misrepresented his

---

[19] *Goguen* addresses fraudulent misrepresentations under § 523(a)(2)(A), using the Restatement (Second) of Torts to inform the analysis. *Goguen*, 691 F.3d at 67 n.3 (noting that *Field v. Mans*, 516 U.S. 59, 70-71 (1995) "tells judges that it is okay to use the Restatement when dealing with 11 U.S.C. § 523(a)(2)(A)"). Although § 523(a)(4) is not addressed in *Goguen*, there is no reason to expect that the analysis would differ as to fraudulent misrepresentations there. *See Husky Int'l Elecs., Inc.*, 578 U.S. at 363 (noting overlap between § 523(a)(2)(A) and § 523(a)(4) as to fraudulent misrepresentation component).

[20] The alleged misrepresentation may well have caused a loss to PCFA, but PCFA is not a plaintiff in this case.

15

intentions. While that may be true, as to the Preexisting Litigation, AIS is in the same position as it would have been if the parties had never entered into the Purchase Agreement and thus cannot have suffered cognizable damage *as a result of* the alleged misrepresentation. Thus, it appears that AIS could not meet its burden on cause in fact on this record.

Even if AIS could meet the burden of showing that it suffered damages caused in fact by misrepresentations made by Mr. Aoude, that alone would not be sufficient. AIS must also establish legal cause, which focuses on foreseeability. *See Goguen*, 691 F.3d at 67, 70 (citing Restatement (Second) of Torts § 548A & cmt. a) (noting that foreseeability "shape[s] and delimit[s] a rational remedy: otherwise the chain of causation could be endless" (alterations in original) (internal quotation marks omitted)). "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Restatement (Second) of Torts § 548A.

> In general, [a] misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates. . . . Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability.

Restatement (Second) of Torts § 548A cmts. a-b (providing examples and noting analogy from legal causation in this intentional tort context to same concept in negligence context). Put another way: "An actor who makes a fraudulent misrepresentation is subject to liability for harm only if the risk of the harm was foreseeably increased by the fraud." Restatement (Third) of Torts: Liab. for Econ. Harm § 12 (succeeding § 548A, among others, in Restatement (Second) of Torts).

AIS does not assert, nor does the summary judgment record readily suggest, that Mr. Aoude's allegedly false promise not to compete foreseeably increased the risk that he would not

16

or could not defend and indemnify AIS in the Preexisting Litigation. That is, from the undisputed material facts, AIS does not appear to establish its prima facie case for legal cause. *See Goguen*, 691 F.3d at 70-71 (cautioning that "when events have run their course, it is easy to label 'foreseeable' everything that has in fact occurred—but this we cannot do" (internal quotation marks omitted)).

If Mr. Aoude misrepresented his intent not to compete, undoubtedly there would be types of losses that could reasonably be expected to result from PCFA's alleged reliance upon that specific false promise. Examples might include losses due to any actual competition and diversion of services that should have been provided by Mr. Aoude through AIS. These are not the types of losses alleged here. Rather, the losses alleged in this case stem from Mr. Aoude's financial inability to continue financing AIS's defense in the Preexisting Litigation and potential future losses if AIS becomes liable under a judgment or settlement. Mr. Aoude's financial difficulties followed from the closure of Mr. Aoude's new practice due to a billing dispute with the insurer for the bulk of his patients. It is unclear how AIS's alleged losses in these circumstances, even when viewed more generally or abstractly, could have been reasonably expected to result from PCFA's reliance upon Mr. Aoude's allegedly false promise not to compete. *See* Restatement (Second) of Torts § 548A. At the time of the Purchase Agreement's execution, it should have been a known risk that Mr. Aoude might one day be unable to pay in connection with the Preexisting Litigation. It is unclear how Mr. Aoude's allegedly false promise not to compete could have foreseeably increased that risk. *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 12.

Without establishing the two elements of causation, AIS cannot succeed. At the hearing on Mr. Aoude's Motion, although not speaking in terms of factual or legal cause specifically, I

17

questioned whether there was a sufficient link between AIS's claimed damages and its allegations of fraud. Having now further developed the issues above as potential grounds for summary judgment in favor of Mr. Aoude, I will provide the parties with a reasonable time to respond.

**IV.    Conclusion**

For the above reasons, the Motion (Dkt. No. 18) will be denied, and the parties will be provided an opportunity to address the Court's stated grounds for granting summary judgment in Mr. Aoude's favor. *See* Fed. R. Civ. P. 56(f)(2)-(3). A separate order consistent with this decision will be issued.

Dated: February 18, 2022                                          By the Court,

                                                                                    _____
                                                                                    Christopher J. Panos
                                                                                    U.S. Bankruptcy Judge